[S. F. No. 4612.   In Bank.—December 19, 1908.]

RUDOLPH HERMAN COMPANY (a Corporation), et al., Appellants, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

PRESIDIO RESERVATION IN SAN FRANCISCO—EASTERLY BOUNDARY LINE.— In an action involving the location of the easterly line of the Presidio reservation in the city and county of San Francisco, under the act of Congress of May 9, 1876, by which a portion thereof relinquished to the city was described as "commencing at the southeasterly corner of said Presidio or Fort Point reservation, and thence running in a direct line due north to the shore line of the bay of San Francisco, thence westerly along the said shore line to a point eighty feet westerly of the easterly line of the said Presidio, or Fort Point reservation, *as established by the United States authorities,* said eighty feet being relinquished for a public highway or street, named Lyon Street," it is held, that the easterly line of the reservation, referred to in the act "as established by the United States authorities," was the line of an old fence extended from a certain cannon planted on May 17, 1850, on the top of the hill, near the present southeastern corner of the reservation and running thence northerly to the bay shore.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   M. C. Sloss, Judge.

The facts are stated in the opinion of the court.

Francis J. Heney, and C. A. S. Frost, for Appellants.

Percy V. Long, City Attorney, and Thomas E. Hayden, for Respondents.

SHAW, J.—The officers of the city and county of San Francisco were about to remove the obstructions upon the lands described in the complaint so as to make them fit for use as a public street, claiming that the same constituted a part of Lyon Street in the city.   It is alleged that the lands were the property of plaintiff, Rudolph Herman, who was in possession, the corporation plaintiff being the owner of an interest in remainder.   The action was to restrain the defendants from entering upon said premises and from opening it as a public street.   Judgment went for the defendants and

the plaintiffs appeal upon the judgment-roll. An agreed statement of the evidence was adopted by the court below as its findings.

The land in controversy is claimed by the defendants to be a portion of Lyon Street lying north of the northerly line of Lewis Street and south of the waters of the bay and adjoining the easterly line of the United States military reservation known as the Presidio. The claim of the plaintiffs is that the true line of the Presidio reservation is situated a considerable distance westerly of the inclosure and possession of the military authorities, that the true line of Lyon Street is immediately adjoining the true line of the Presidio and extending eighty feet east thereof, and that, if the Presidio and street are so located, the land claimed by them is not a part of Lyon Street, but is a part of the lands ceded to the city by the United States government by the act of Congress of May 9, 1876. The accuracy of this contention is the sole point to be decided in the case. A somewhat extended statement of the facts is necessary to a clear understanding of the question.

On November 6, 1850, President Fillmore made an order reserving for military purposes a tract including with the present Presidio reservation the lands lying between it and the Fort Mason reservation. One Dexter R. Wright was then pressing a claim under an alleged Mexican grant to a large tract of land covering all of the lands reserved and considerable of the adjoining lands. This claim was afterwards adjudged to be invalid. General Riley, at that time in command of the military post at San Francisco, considered it of sufficient importance to enter into negotiations on behalf of the United States with him for a settlement of his claim as far as it affected the Presidio reservation. A provisional agreement was made between them whereby the military occupation was to be withdrawn from all the land lying easterly of a line drawn parallel with Larkin Street in San Francisco and extending on said course northerly to the bay from a certain cannon planted by Captain Keyes on May 17, 1850, on the top of the hill near the present southeastern corner of the Presidio reservation. This agreement was reported by General Riley to the war department and it was thereupon disapproved and rejected by the secretary of war. No further action was ever taken regarding it. While it was pending in

CLIV Cal.—44

the war department, General Riley withdrew possession of the United States from the territory situated east of the line parallel with Larkin Street, as that line was then supposed to be located, and a fence was erected on said supposed line. In the mean time it had been reported to the president that the original reservation contained more land than was necessary for military purposes and that squatters were in possession of some of the land lying easterly of the present reservation. On December 31, 1851, the president issued another executive order changing the former order by declaring that there was reserved for the United States for military purposes on the San Francisco peninsula "all the land north of a line running in a westerly direction from the southeastern corner of the Presidio tract to the southern extremity of a pond lying between Fort Point and Point Lobos, and passing through the middle of said pond and its outlet to the channel of entrance from the ocean." The southeastern corner of the Presidio tract had then been established as the point where the cannon had been planted by Captain Keyes as aforesaid. The line described in the order was the southern boundary of the Presidio tract as established by the previous order. The order of 1851 was understood, as its words properly interpreted should be understood, to fix, as the easterly boundary of the reservation, a line extending from the said cannon planted as the southeastern corner of the Presidio tract, due north to the bay shore. Thereafter, until the enactment of the act of Congress of May 9, 1876, this line constituted the legal boundary line of the Presidio, on the easterly side. The line was never laid off or designated by any monuments. The actual occupation of the military authorities extended east only to the line of the fence aforesaid. Private persons, presumably understanding that this was the extent of the limits claimed by the United States, entered upon the intervening lands lying east of the fence and west of the due north line, claiming right thereto. Various surveys were made from time to time by different engineers of the United States, some acting under the authority of the interior department and some acting under the authority of the war department, but no authoritative location of the true line of the military reservation was made. In 1870 a survey by Lieutenant Wheeler of the United States army disclosed the fact that the fence was

not built on a line parallel with Larkin Street, which was on a course running north 9° 15′ west, but was built on a course running north 7° 30′ west. The matter had been reported to Congress by the secretary of war and on May 9, 1876, Congress passed an act for the purpose of relinquishing the land not claimed by the military authorities in San Francisco as a part of the military reservation and of enabling the persons in possession of the lands east of the fence to obtain title to their lands. By this act it was declared that all the right and title of the United States to the portion of the Presidio reservation therein described was relinquished to the city of San Francisco and its successors "for the benefit of persons who, if the said land had not been reserved for public use, would have been entitled thereto," under city ordinance No. 800 and the act of the legislature of California of March 27, 1868. The boundaries of the tract relinquished, as described in the act, were as follows: "Commencing at the southeasterly corner of said Presidio or Fort Point reservation, and thence running in a direct line due north to the shore line of the bay of San Francisco, thence westerly along the said shore line to a point eighty feet westerly of the easterly line of the said Presidio, or Fort Point reservation, *as established by the United States authorities,* said eighty feet being relinquished for a public highway or street, named Lyon Street; thence southerly to a point on the southerly line of said reservation, where the west line of Lyon Street intersects said line; thence easterly to the point of commencement, to conform as near as possible to the plan of the city map of the streets of San Francisco outside of reservation, said plan being now on file in the office of the war department of the city of Washington:

"*Provided,* that Lyon Street shall be extended to the bay of San Francisco, eighty feet wide, and is hereby dedicated for a public highway and street forever." It will be observed that the easterly line of the Presidio reservation according to this declaration was to be a line eighty feet westerly of the easterly line thereof "as established by the United States authorities." The entire case depends upon the interpretation to be given to this phrase.

It is claimed on the part of the appellant that by reason of the agreement between General Riley and Wright regarding the boundary line to which the military occupation should

extend, and certain correspondence and reports on the subject, the true line established by the military authorities was a line parallel with Larkin Street, that is, a line running northerly from the point where the cannon was planted to the bay shore on a course north 9° 15′ west, and that this was the line intended to be fixed as the boundary by the said act of Congress.

The facts stated in the findings show that this line never was established by the United States authorities. General Riley did make an attempt to establish such a line in pursuance of his agreement with Wright. But he was without authority to make any final determination of the matter. He reported the agreement to the war department, with his recommendation, and the proposition was disapproved. The correspondence between the respective army officers and the reports made by them, in several instances refer to the "line parallel with Larkin Street" as the eastern boundary of the Presidio, but that line was never marked out or observed, and there was no change ever made either in the legal boundary or in the line of actual occupation and possession. The legal boundary remained the due north line running northerly from the cannon to the bay shore and the line of possession continued to extend to the fence aforesaid, the military authorities occupying all the space westerly of the fence, and squatters and claimants occupying the lands between the fence and the due north line fixed by presidential order. This was the condition of affairs when the act of 1876 was passed. Although the fence was not the true legal boundary, it was manifestly then well known as the actual visible line of the military occupation and, in that sense, it was the easterly line of the reservation established by the United States authorities in charge and possession. The language of the act shows that by the designation of an easterly line of the Presidio reservation "established by the United States authorities," lying westerly of the true legal line thereof, some line was there intended other than the true line. There was no other line answering the description of a line established by the United States authorities, except the line of this old fence, the line actually established and maintained as the boundary of their possession by the military authorities in command of the Presidio. This, therefore, must have been the line referred to in the act as the landmark eighty feet west of which the new line was to be run.

This construction of the act of 1876 was the one adopted by the authorities charged with the execution of the act. The military authorities in charge of the Presidio reservation, in accordance with instructions from the war department, immediately thereafter took down the old fence and erected a new fence as such boundary, placing it on a line beginning on the bay shore eighty feet westerly of the old fence line and running to the point where the westerly line of Lyon Street intersected the southerly line of the Presidio reservation some one hundred and ten feet westerly from the said cannon set as the southeast corner of the reservation, and from that time until the present the line so fixed and the fence so erected has marked the eastern boundary of the Presidio reservation, and the possession of the United States has extended easterly to that point and no further. The interior department caused a survey to be made establishing the line of this fence and thereafter, under its recommendation, a patent was issued to the city of San Francisco in accordance with the act of 1876, granting all the lands included in the original reservation and extending westerly to this line, but not beyond. It is true, there were a number of preliminary surveys, one of which attempted to fix as the boundary a line on a course parallel with Larkin Street, and one of which assumed that the only line established by the United States authorities was the due north line fixed by the presidential order of 1851. There were also varying decisions of a preliminary character made by the commissioner of the land-office and the secretary of the interior concerning the true interpretation of the act of 1876. But the final decision of the secretary of the interior was that the "line established by the United States authorities" therein mentioned was the line of the old fence above referred to and a patent was issued in accordance with that decision. The authorities of the war department contended from the first that this old fence was the easterly line of the Presidio reservation referred to in the act of 1876 and their contention was finally acceded to by the interior department.

At the time the old fence was located and established, the entire property was within the reservation of the United States, the legal line thereof being situated some distance easterly of the line of the fence. It was therefore entirely within the power of the commandant of the Presidio to establish the line

of his occupation at any point within the reservation and westerly of the true line. His superior officers might countermand his orders and compel him to change his line, but no private individual occupying lands within the legal lines of the military reservation would have any right to dispute his authority in establishing the line where the fence was located. It appears with reasonable certainty that the intention was to locate this fence on a line parallel with Larkin Street, but by some mistake it was not correctly located. If private persons had any rights depending upon the accuracy of this location it may be conceded that they would have a right to dispute its accuracy, but they had none. The land all belonged to the United States and the question whether it was located on a true parallel with Larkin Street or on some line supposed to be so, but not actually so, was a matter of no concern to mere squatters, whether outside or inside the legal bounds of the Presidio. They would have no right to a resurvey or inquiry to determine whether the fence line which Congress referred to was or was not originally located by the subordinate officers on the precise course directed by their superiors. Its actual course was the course intended by Congress.

The strip of land eighty feet wide, immediately east of the new line located in pursuance of the act of 1876, was effectually dedicated as a public street and could not be alienated by the city. The city had ample authority to clear obstructions from this territory and open it up so as to make it passable for public travel. The injunction was properly refused.

The judgment is affirmed.

Angellotti, J., Henshaw, J., and Lorigan, J., concurred.